# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**FEDERAL TRADE COMMISSION,**

        **Plaintiff,**

**v.**                                **Case No:   6:17-cv-2048-Orl-41LRH**

**HIGHER GOALS MARKETING LLC,
SUNSHINE FREEDOM SERVICES LLC,
BRANDUN L ANDERSON, LEA A.
BROWNELL, MELISSA M. DEESE,
GERALD D. STARR, JR., TRAVIS L.
TEEL and WAYNE T. NORRIS,**

        **Defendants.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

This cause came on for consideration without oral argument on the following motion filed herein:

| | |
|---|---|
| **MOTION:** | **PLAINTIFF'S MOTION FOR ENTRY OF DEFAULT JUDGMENT AGAINST DEFENDANT HIGHER GOALS MARKETING LLC (Doc. 84)** |
| **FILED:** | **March 29, 2019** |

**THEREON** it is respectfully **RECOMMENDED** that the motion be **GRANTED**.

## I.    Background

The Federal Trade Commission (FTC) filed this action alleging that since July 2016 Defendants Brandun L. Anderson, Lea A. Brownell, Melissa M. Deese, Gerald D. Starr, Jr., and Travis L. Teel acted through Sunshine Freedom Services LLC (SFS), and Higher Goals Marketing

LLC (HGM) (collectively, the Defendants) to engage in a telemarketing scheme that defrauded financially distressed consumers throughout the United States by selling them bogus credit-card interest-rate-reduction services.   (Doc. 1 at ¶¶ 2, 25).   Specifically, the Defendants initiated or directed others to initiate prerecorded telemarketing calls to consumers throughout the United States, many of whom were on the National Do Not Call Registry (Do-Not-Call-Registry), offering them a chance to lower their credit card interest rates.   (*Id*. at ¶¶ 4, 26, 42).   The prerecorded message instructed interested consumers to press a number on their keypad, which resulted in the consumer being transferred to a live representative that worked for the Defendants.   (*Id*. at ¶¶ 4, 26).   Once connected to a live representative, the consumers were told that the Defendants will substantially and permanently reduce their credit card interest rates resulting in thousands of dollars in savings. (*Id*. at ¶¶ 5, 27-28, 53).   In order to obtain this service, the consumer had to pay the Defendants an up-front fee, which ranged from $500.00 to $5,000.00.   (*Id*. at ¶¶ 6, 29).   However, the Defendants did not inform the consumer prior to payment of the up-front fee that the consumer would likely have to pay additional fees for reduced interest rates.   (*Id*. at ¶¶ 6, 30, 57).

After receiving the up-front fee, the Defendants, in some instances, contacted the consumer's credit-card issuer and asked it to lower the consumer's interest rate.   (*Id*. at ¶ 31).   Some credit card issuers agreed to a modest interest rate reduction (while others did not), but the reduction rarely, if ever, resulted in a permanent or substantially lower interest rate and/or in savings to the consumer of thousands of dollars.   (*Id*. at ¶¶ 32-34).

In other instances, the Defendants tried to make good on their promises by obtaining a new credit card that had a low introductory, promotional interest rate and then directing the consumer to transfer the balance from their existing credit card to the new credit card.   (*Id*. at ¶ 35).   As part of this process, the consumer would often pay a one-to-three percent balance transfer fee – which the

Defendants did not disclose prior to payment of the up-front fee – to move their existing credit card balance to the promotional credit card.   (*Id.* at ¶¶ 6, 36-37).   The reduced interest rate provided by the promotional credit cards likewise rarely, if ever, resulted in permanently lower interest rates and/or savings in the thousands of dollars.   (*Id.* at ¶¶ 38-39).   Instead, in most cases, the interest rates on the promotional credit cards increased significantly at the end of the promotional period. (*Id.* at ¶¶ 8, 38).

In light of the foregoing, the FTC asserts that the Defendants' claims that they could permanently and substantially lower a consumer's credit card interest rate and save the consumer thousands of dollars were false and deceptive acts that violated Section 5(a) of the Federal Trade Commission Act (FTC Act), 15 U.S.C. § 45(a) (Counts I and II).   (*Id.* at ¶¶ 40-41, 53-58).   In addition, the FTC asserts that the Defendants' actions and omissions also violated the following provisions of Telemarketing Sales Rule (TSR), 16 C.F.R. Pt. 310: Count III – misrepresenting material aspects of debt relief services in violation of 16 C.F.R. § 310.3(a)(2)(x); Count IV – failing to disclose the total cost of debt relief services in violation of 16 C.F.R. § 310.3(a)(1)(i); Count V – charging or receiving a fee in advance of providing debt relief services in violation of 16 C.F.R. § 310.4(a)(5)(i); Count VI – calling consumers on the Do-Not-Call Registry in violation of 16 C.F.R. § 310.4(b)(1)(iii)(B); Count VII – initiating unlawful prerecorded messages in violation of 16 C.F.R. § 310.4(b)(1)(v)(A); and Count VIII – failing to pay fees for access to telephone numbers included on the Do-Not-Call Registry in violation of 16 C.F.R. § 310.8.   (*Id.* at 15-17).[1]   Based on the foregoing, the FTC requested the Court enter a preliminary injunction and appoint a receiver over

---

[1] The FTC also asserted a single, separate claim solely against Defendant Wayne T. Norris. (Doc. 1 at ¶¶ 81-82).   That claim is not at issue in the matter before the Court, so there is no need to discuss it any further.

the corporate defendants,[2] a permanent injunction prohibiting future violations of the FTC Act and TSR, an award of damages to redress the injuries suffered by the consumers, and costs for bringing the action.   (*Id*. at 19).

The FTC and Defendants Anderson, Brownell, Deese, Starr, Teel, Norris, and SFS (collectively, the Settling Defendants) reached a settlement of their claims, and FTC moved for the entry of an agreed upon Stipulated Order for Permanent Injunction and Monetary Judgment (the Stipulated Order).   (Doc. 80).   The Court granted the motion and entered the Stipulated Order on March 18, 2019.   (Doc. 82).   Thus, the only claims that remain outstanding in this case are those against HGM.

The present motion by the FTC seeks to resolve those remaining claims.   The Clerk entered default against HGM on March 27, 2018.   (Doc. 71).   The FTC now moves for default judgment against HGM seeking the entry of a multifaceted permanent injunction and award of damages totaling $3,149,920.34.   (Doc. 84 (Motion for Default Judgment)).   In support, the FTC has attached a proposed order for the Court's consideration, a declaration from Reeve Tyndall, an investigator with the FTC, and the depositions of Defendants Anderson, Brownell, Deese, Starr, and Teel.   (Docs. 84-1; 84-2; 84-3; 84-4; 84-5; 84-6; 84-7).   The receiver appointed by the Court to oversee HGM while this case is pending and HGM's sole manager, Defendant Anderson, do not oppose the relief sought in the Motion for Default Judgment.   (Doc. 84 at 6).   The matter is now ripe for review.

---

[2] The Court entered a stipulated preliminary injunction against the Defendants in December 2017, which, in relevant part, placed a temporary freeze on HGM's assets and appointed Attorney Mark J. Bernet as receiver over HGM.   (Doc. 53).

## II.      Standard of Review

The Federal Rules of Civil Procedure establish a two-step process for obtaining default judgment.   First, when a party against whom a judgment for affirmative relief is sought fails to plead or otherwise defend as provided by the Federal Rules of Civil Procedure, and that fact is made to appear by affidavit or otherwise, the Clerk enters default.   Fed. R. Civ. P. 55(a).   Second, after obtaining clerk's default, the plaintiff must move for default judgment.   Fed. R. Civ. P. 55(b). Before entering default judgment, the court must ensure that it has jurisdiction over the claims and parties, and that the well-pled factual allegations of the complaint, which are assumed to be true, adequately state a claim for which relief may be granted.   *See Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975).[3]

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."   Fed. R. Civ. P. 8(a)(2).   This standard does not require detailed factual allegations, but does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).   Thus, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"   *Id*. (quoting *Twombly*, 550 U.S. at 570).   To state a plausible claim for relief, a plaintiff must go beyond merely pleading the "sheer possibility" of unlawful activity by a defendant and offer "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Id*. (citing *Twombly*, 550 U.S. at 556).   If a plaintiff fails to meet this pleading standard, then the plaintiff will not be entitled to default judgment.

---

[3] The Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.   *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

If the plaintiff is entitled to default judgment, then the court must consider whether the plaintiff is entitled to the relief requested.   If the plaintiff seeks damages, the plaintiff bears the burden of demonstrating entitlement to recover the amount of damages sought in the motion for default judgment.   *Wallace v. The Kiwi Grp., Inc.*, 247 F.R.D. 679, 681 (M.D. Fla. 2008).   Unlike well-pled allegations of fact, allegations relating to the amount of damages are not admitted by virtue of default; rather, the court must determine both the amount and character of damages.   *Id*. (citing *Miller v. Paradise of Port Richey, Inc.*, 75 F. Supp. 2d 1342, 1346 (M.D. Fla. 1999)).   Therefore, even in the default judgment context, "[a] court has an obligation to assure that there is a legitimate basis for any damage award it enters[.]"   *Anheuser Busch, Inc. v. Philpot*, 317 F.3d 1264, 1266 (11th Cir. 2003); *see Adolph Coors Co. v. Movement Against Racism and the Klan*, 777 F.2d 1538, 1544 (11th Cir. 1985) (explaining that damages may be awarded on default judgment only if the record adequately reflects a basis for an award of damages).   Ordinarily, unless a plaintiff's claim against a defaulting defendant is for a liquidated sum or one capable of mathematical calculation, the law requires the district court to hold an evidentiary hearing to fix the amount of damages.   *See Adolph Coors*, 777 F.2d at 1543-44.   However, no hearing is needed "when the district court already has a wealth of evidence from the party requesting the hearing, such that any additional evidence would be truly unnecessary to a fully informed determination of damages."   *See S.E.C. v. Smyth*, 420 F.3d 1225, 1232 n.13 (11th Cir. 2005); *see also Wallace*, 247 F.R.D. at 681 ("a hearing is not necessary if sufficient evidence is submitted to support the request for damages").

III.     **Analysis**

   **A.  Subject Matter and Personal Jurisdiction**

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and personal jurisdiction over HGM, which is a Florida limited liability company with its principle place of business in Florida (Doc. 1 at ¶ 15).

   **B.  The Entry of Default**

HGM's registered agent was served with process on December 4, 2017.  (Doc. 47); Fed. R. Civ. P. 4(h); Fla. Stat. § 48.081(3)(a).  HGM had twenty-one days from the date of service to respond to the Complaint.  Fed. R. Civ. P. 12(a)(1)(A)(i).  HGM did not timely respond to the Complaint, and the FTC moved for and the Clerk properly entered default against HGM.  (Docs. 68; 71).

   **C.  Liability**

   **1.  Section 5(a) of the FTC ACT**

In Counts I and II of the Complaint, the FTC claims that HGM violated Section 5(a) of the FTC Act, which prohibits "unfair or deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45(a)(1).  The FTC alleges that HGM engaged in a telemarketing scheme that defrauded financially distressed consumers throughout the United States by selling them bogus credit-card interest-rate-reduction services.  (Doc. 1 at ¶¶ 4, 24-25).  By its default, HGM has admitted to the foregoing well-pleaded factual allegations, which are sufficient to establish that HGM engaged in acts or practices in or affecting commerce.

Next, to establish that HGM committed an act or engaged in a practice that violates Section 5(a) of the FTC Act, the FTC must establish that: 1) there was a representation; 2) the representation was likely to mislead consumers acting reasonably under the circumstances; and 3) the

misrepresentation was material.  *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003) (citations omitted).  "A representation is material if it is of a kind usually relied upon by a reasonably prudent person."  *FTC v. Transnet Wireless Corp*., 506 F. Supp. 2d 1247, 1266 (S.D. Fla. 2007) (citations omitted).  In addition, expressly false claims or deliberately-made implied claims used to induce the purchase of a product or service are presumed to be material.  *FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1272 (S.D. Fla. 1999) (citations omitted).

Here, the FTC alleges that HGM represented to consumers that it could substantially and permanently reduce their credit card interest rates resulting in thousands of dollars in savings. (Doc. 1 at ¶¶ 5, 27-28, 53).  In doing so, HGM also allegedly failed to disclose to consumers that its rate-reduction services may result in the consumer having to pay a variety of fees to the credit-card issuers, such as a balance transfer fee.  (*Id*. at ¶¶ 6, 30, 57).  These representations and omissions were likely to mislead consumers into purchasing HGM's services.  Further, HGM's representations were false since, in most cases, consumers never received a substantially and permanently reduced interest rate that resulted in thousands of dollars in savings.  (*Id*. at ¶¶ 32-34, 38-39, 54).  Given the falsity of HGM's representations, they are presumed to be material. *SlimAmerica*, 77 F. Supp. 2d at 1272.  Moreover, HGM's failure to disclose the possibility that consumers may have to pay additional, undisclosed fees as a result of HGM's services is also material, since it is likely that if a reasonably prudent consumer was made aware of that possibility they would not have paid for HGM's services.  By its default, HGM has admitted to these well-pleaded factual allegations, which are sufficient to establish that HGM's representations and omissions in connection with the sale of credit-card interest-rate-reduction services violated Section 5(a) of the FTC Act.  The undersigned therefore finds that the FTC is entitled to default judgment on Counts I and II of the Complaint.

### 2.   The Telemarketing Sales Rule

In Counts III through VIII of the Complaint, the FTC claims that HGM violated various provisions of the TSR.   The undersigned will address each alleged violation in turn.

### a.   16 C.F.R. § 310.3

In Counts III and IV of the Complaint, the FTC claims that HGM violated 16 C.F.R. § 310.3(a)(1)(i) and (a)(2)(x) (*Id*. at ¶¶ 72-75), which provide, in relevant part, as follows:

> (a) Prohibited deceptive telemarketing acts or practices. It is a deceptive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct:
>
> (1) Before a customer consents to pay for goods or services offered, failing to disclose truthfully, in a clear and conspicuous manner, the following material information:
>
> (i) The total costs to purchase, receive, or use, and the quantity of, any goods or services that are the subject of the sales offer;
>
> ***
>
> (2) Misrepresenting, directly or by implication, in the sale of goods or services any of the following material information:
>
> ***
>
> (x) Any material aspect of any debt relief service, including, but not limited to, the amount of money or the percentage of the debt amount that a customer may save by using such service; the amount of time necessary to achieve the represented results; the amount of money or the percentage of each outstanding debt that the customer must accumulate before the provider of the debt relief service will initiate attempts with the customer's creditors or debt collectors or make a bona fide offer to negotiate, settle, or modify the terms of the customer's debt; the effect of the service on a customer's creditworthiness; the effect of the service on collection efforts of the customer's creditors or debt collectors; the percentage or number of customers who attain the represented results; and whether a debt relief service is offered or provided by a non-profit entity.

The TSR defines "telemarketing" as "a plan, program, or campaign which is conducted to induce the purchase of goods or services . . . , by use of one or more telephones and which involves

more than one interstate telephone call."   16 C.F.R. § 310.2(gg).   The TSR defines "seller" as "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration," and it defines "telemarketer" as "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer . . .."   16 C.F.R. § 310.2(dd), (ff).   "Person," in turn, is defined as "any individual, group, unincorporated association, limited or general partnership, corporation, or other business entity."   16 C.F.R. § 310.2(y).   Finally, "debt relief service" is defined as "any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector."   16 C.F.R. § 310.2(o).

As an initial matter, the undersigned must determine whether the allegations in the Complaint establish that HGM is covered by the TSR.   The FTC alleges that HGM initiated or directed others to initiate telemarketing calls to consumers throughout the United States to provide them a service – lowering their credit card interest rates – in exchange for a fee ranging between $500.00 to $5,000.00.   (Doc. 1 at ¶¶ 4, 6, 26, 29, 42).   These allegations, which must be accepted as true, are sufficient to establish that HGM is both a seller and telemarketer engaged in telemarketing of debt relief services within the meaning of the TSR.   Therefore, HGM is subject to the TSR.

Turning to HGM's violations of 16 C.F.R. § 310.3, the FTC alleges that HGM told consumers that they could substantially and permanently reduce their credit card interest rates resulting in thousands of dollars in savings.   (*Id*. at ¶¶ 5, 27-28, 53).   In order to obtain HGM's services, the consumer had to pay HGM an up-front fee, which ranged from $500.00 to $5,000.00.

(*Id*. at ¶¶ 6, 29).   However, the Defendants did not inform the consumer prior the payment of the up-front fee that the consumer would likely have to pay additional fees for reduced interest rates. (*Id*. at ¶¶ 6, 30, 57).   In most cases, HGM did not substantially and permanently reduce an individual consumer's credit card interest rates resulting in thousands of dollars in savings.   (*Id*. at ¶¶ 32-34, 38-39).   These allegations, which must be accepted as true, are sufficient to establish that HGM violated 16 C.F.R. § 310.3(a)(1)(i) and (a)(2)(x).

    **b.  16 C.F.R. § 310.4**

In Counts V through VII of the Complaint, the FTC claims that HGM violated 16 C.F.R. § 310.4(a)(5)(i), (b)(1)(iii)(B), and (b)(1)(v)(A) (*Id*. at ¶¶ 76-79), which provide, in relevant part, as follows:

(a) Abusive conduct generally. It is an abusive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct:

\*\*\*

(5) (i) Requesting or receiving payment of any fee or consideration for any debt relief service until and unless:

    (A) The seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer;

    (B) The customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor or debt collector; and

    (C) To the extent that debts enrolled in a service are renegotiated, settled, reduced, or otherwise altered individually, the fee or consideration either:

        (1) Bears the same proportional relationship to the total fee for renegotiating, settling, reducing, or altering the terms of the entire debt balance as the individual debt amount bears to the entire debt amount. The individual debt amount and the entire debt amount are those owed at the time the debt was enrolled in the service; or

(2) Is a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration. The percentage charged cannot change from one individual debt to another. The amount saved is the difference between the amount owed at the time the debt was enrolled in the service and the amount actually paid to satisfy the debt.

\*\*\*

(b) Pattern of calls.

(1) It is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer to engage in, or for a seller to cause a telemarketer to engage in, the following conduct:

\*\*\*

(ii) Initiating any outbound telephone call to a person when:

\*\*\*

(B) That person's telephone number is on the "do-not-call" registry, maintained by the Commission, of persons who do not wish to receive outbound telephone calls to induce the purchase of goods or services unless the seller or telemarketer:

(1) Can demonstrate that the seller has obtained the express agreement, in writing, of such person to place calls to that person. Such written agreement shall clearly evidence such person's authorization that calls made by or on behalf of a specific party may be placed to that person, and shall include the telephone number to which the calls may be placed and the signature of that person; or

(2) Can demonstrate that the seller has an established business relationship with such person, and that person has not stated that he or she does not wish to receive outbound telephone calls under paragraph (b)(1)(iii)(A) of this section[.]

\*\*\*

(v) Initiating any outbound telephone call that delivers a prerecorded message, other than a prerecorded message permitted for compliance with the call abandonment safe harbor in § 310.4(b)(4)(iii), unless:

(A) In any such call to induce the purchase of any good or service, the seller has obtained from the recipient of the call an express agreement, in writing, that:

(i) The seller obtained only after a clear and conspicuous disclosure that the purpose of the agreement is to authorize the seller to place prerecorded calls to such person

(ii) The seller obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service;

(iii) Evidences the willingness of the recipient of the call to receive calls that deliver prerecorded messages by or on behalf of a specific seller; and

(iv) Includes such person's telephone number and signature[.]

Here, The FTC alleges that HGM initiated or directed others to initiate prerecorded telemarketing calls to consumers throughout the United States, many of whom were on the Do-Not-Call-Registry, offering them a chance to lower their credit card interest rates.   (*Id*. at ¶¶ 5, 27-28, 53).   In order to obtain HGM's services, the consumer had to pay HGM an up-front fee.   (*Id*. at ¶¶ 6, 29).   These allegations, which must be accepted as true, are sufficient to establish that HGM violated 16 C.F.R. § 310.4(a)(5)(i), (b)(1)(iii)(B), and (b)(1)(v)(A).

### c. 16 C.F.R. § 310.8

In Count VIII of the Complaint, the FTC claims that HGM violated 16 C.F.R. § 310.8 (*Id*. at ¶ 80), which provides, in relevant part, as follows:

(a) It is a violation of this Rule for any seller to initiate, or cause any telemarketer to initiate, an outbound telephone call to any person whose telephone number is within a given area code unless such seller, either directly or through another person, first has paid the annual fee, required by § 310.8(c), for access to telephone numbers within that area code that are included in the National Do Not Call Registry maintained by the Commission under § 310.4(b)(1)(iii)(B) . . .

(b) It is a violation of this Rule for any telemarketer, on behalf of any seller, to initiate an outbound telephone call to any person whose telephone number is within a given area code unless that seller, either directly or through another person, first

has paid the annual fee, required by § 310.8(c), for access to the telephone numbers within that area code that are included in the National Do Not Call Registry . . .

Here, The FTC alleges that HGM initiated or directed others to initiate telemarketing calls to telephone numbers in various area codes without first paying the annual fee for access to the telephone numbers within such area codes that are included in the Do-Not-Call Registry.   (Doc. 1 at ¶¶ 44, 80).   These allegations, which must be accepted as true, are sufficient to establish that HGM violated 16 C.F.R. § 310.8.

In summary, the undersigned finds that the FTC is entitled to default judgment against HGM on Counts I through VIII of the Complaint.   Now, the undersigned turns to the relief sought.

**D. Relief**

The FTC seeks injunctive relief, equitable monetary relief, and several types of ancillary relief (Doc. 84 at 14-19), which have been detailed in the proposed order attached to the Motion for Default Judgment (Doc. 84-1).   The undersigned will consider each request in turn.

**1. Permanent Injunction**

The FTC seeks a permanent injunction enjoining HGM from: 1) participating in telemarketing; 2) advertising debt relief products or services; 3) engaging in misrepresentations and deceptive omissions; 4) engaging in certain types of unlawful payment and billing practices; 5) mishandling customer information; and 6) collecting on outstanding accounts.   (Docs. 84 at 10-13; 84-1 at 7-9, 11-12).

The FTC Act permits the Court to enter a permanent injunction under appropriate circumstances.   15 U.S.C. § 53(b).   To determine whether a permanent injunction is appropriate, "the test is whether the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future."   *FTC v. Lalonde*, 545 F. App'x 825, 841 (11th Cir. 2013) (quoting

*CFTC v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1346-47 (11th Cir. 2008)).   To assess the likelihood of future misconduct, courts consider "the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations."   *FTC v. RCA Credit Servs., LLC*, 727 F. Supp. 2d 1320, 1335 (M.D. Fla. 2010) (quoting *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1322 (11th Cir. 1982)).

In addition to enjoining the defendant from specific violations, courts also have discretion to include "fencing-in" provisions that extend beyond the specific violations at issue in the case to prevent a defendant from engaging in similar deceptive practices in the future.   *RCA Credit Servs., LLC*, 727 F. Supp. 2d at 1335 (citing *FTC v. Colgate–Palmolive Co.*, 380 U.S. 374, 395 (1965) ("The Commission is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past. Having been caught violating the [FTC] Act, respondents must expect some fencing in.") (internal quotation marks and citations omitted); *Litton Indus., Inc. v. FTC*, 676 F.2d 364, 370 (9th Cir.1982) ("Fencing-in provisions serve to close all roads to the prohibited goal, so that [the FTC's] order may not be by-passed with impunity.") (internal quotation marks and citation omitted)).   "Fencing-in provisions must bear a reasonable relation to the unlawful practices found to exist."   *Id.* (internal quotation marks and citation omitted).

The FTC has pointed to uncontroverted evidence establishing that HGM began operating its deceptive debt relief telemarketing scheme several weeks <u>after</u> the Court entered a temporary restraining order in *FTC v. Life Mgmt. Servs. of Orange Cty., LCC*, No. 6:16-cv-982-Orl-41TBS (M.D. Fla.) against a similar operation (Life Management Service of Orange County, LLC).   (Doc. 84 at 15).   The individuals that set up HGM had connections with the individuals involved in the

*Life Management* case and used some of the same materials that Life Management used in its telemarketing scheme.  (*Id*. (citing Doc. 15 at 9)).  The FTC contends this egregious conduct in the shadow of ongoing federal litigation relating to a similar scheme justifies the injunctions sought in the Motion for Default Judgment.  (*Id*. at 15-18).  The undersigned agrees.

The factual allegations in the Complaint, which must be accepted as true, and the uncontroverted evidence highlighted by the FTC, demonstrate that HGM began operating its telemarketing scheme while federal litigation continued against a similar entity challenging a similar telemarketing scheme, and that HGM had connections to this other entity.  (Docs. 1 at ¶¶ 9-10, 46-47; 15 at 8-9 (discussing the connection between Life Management and HGM)).  *See Life Mgmt. Servs.*, No. 6:16-cv-982-Orl-41TBS, Doc. 36 (M.D. Fla. June 8, 2016) (temporary restraining order). The allegations and evidence before the undersigned further demonstrate that HGM engaged in a telemarketing scheme during which it made material misrepresentations to consumers throughout the United States regarding its credit card interest-rate-reduction services in violation of the FTC Act and numerous provisions of the TSR.  (*See supra* pp. at 7-14).  This egregious and recurrent conduct affected more than a thousand consumers resulting in millions of dollars in damages.  (*See* Docs. 15-34 at ¶ 10; 84-2).  Considering the foregoing, the undersigned finds HGM's unlawful conduct and the need to protect the public from future violations warrants the imposition of the injunctions sought by the FTC, including those injunctions that do not directly relate to violations committed by HGM, such as the general prohibition against making material misrepresentations or deceptive omissions in connection with the marketing and sale of any service or product.  *See F.T.C. v. Glob. Mktg. Grp., Inc.*, 594 F. Supp. 2d 1281, 1290 (M.D. Fla. 2008) ("A permanent injunction restraining a defendant from engaging, directly or indirectly, in any and all future

involvement with telemarketing operations is an appropriate remedy if it would protect the public from potential future violations by the defendant." (quotation marks and citation omitted)).

### 2. **Equitable Monetary Relief**

The FTC seeks restitution for the full amount of the consumer injury, *i.e.* $3,149,920.34, caused by HGM's unlawful telemarketing scheme.   (Doc. 84 at 18-19).

In addition to injunctive relief, the FTC may seek "payment of consumer redress" in the form of restitution and/or disgorgement of unlawfully obtained funds.   *McGregor v. Chierico*, 206 F.3d 1378, 1387 (11th Cir. 2000).   To establish entitlement to such relief, the FTC must show injury to the consumers, but it is not required to show actual reliance by each individual consumer.   *Id*. at 1388.   "A presumption of actual reliance arises once the [FTC] has proved that the defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product."   *Id*. (quotation omitted).

As discussed above, The FTC has established that HGM made material misrepresentations to consumers throughout the United States regarding its credit card interest-rate-reduction services. (*See supra* pp. at 7-14).   Further, the FTC has presented undisputed evidence that consumers purchased HGM's services.   (*See* Docs. 15 at 9 (citing Doc. 15-34 at ¶ 10); 84-2).   Thus, the FTC is entitled to restitution on behalf of the consumers that were affected by HGM's unlawful telemarketing scheme.

The proper amount of restitution is "the amount of net revenue (gross receipts minus refunds)[.]"   *F.T.C. v. Washington Data Res., Inc.*, 704 F.3d 1323, 1327 (11th Cir. 2013).   To establish the amount of restitution due, the FTC "must show that its calculations reasonably approximated the amount of customers' net losses," but "[t]he calculation may be properly based on estimates."   *RCA Credit Servs., LLC*, 727 F. Supp. 2d at 1336-37 (citations omitted).   Once the

FTC has sufficiently calculated the amount of restitution, "the burden shifts to the defendants to show that those figures [are] inaccurate." *Id*.

The FTC points to the March 29, 2019 declaration from Mr. Tyndall, an investigator with the FTC, in support of the restitution sought. (Doc. 84 at 19). Mr. Tyndall declares that he investigated HGM and, during that investigation, reviewed a Microsoft Excel spreadsheet called the "HGM Fulfillment Log" (the Log) that was maintained by HGM in its ordinary course of business. (Doc. 84-2 at ¶ 3). The Log contains a tab for each week between July 2016 and November 2017, and each tab contains rows for each client that purchased HGM's services. (*Id*. at ¶¶ 4-5). The rows named, among other things, the client and the amount the client paid to HGM for its services. (*Id*.). The rows were also highlighted either yellow, which represented monies paid to HGM, or red, which represented refunds that HGM issued to the client. (*Id*. at ¶ 5). Mr. Tyndall declares that he "calculated the total amount that [HGM] received from its clients, less refunds, between July 28, 2016, and November 29, 2017, as reflected in the [Log]." (*Id*. at ¶ 6). Based on this calculation, Mr. Tyndall declares that HGM "received from consumers during the period in which [it] operated, less any refunds issued, . . . approximately $3,149,920.34." (*Id*. at ¶ 7). Mr. Tyndall's analysis is sufficient to reasonably approximate the amount of HGM's net revenue, and HGM has not presented any evidence to rebut the accuracy of Mr. Tyndall's calculations. *See FTC v. Life Mgmt. Servs. of Orange Cty., LCC*, 350 F. Supp. 3d 1246, 1274 (M.D. Fla. 2018) (relying solely on the uncontroverted affidavit of a forensic accountant in determining the amount of restitution the defendant must pay to the FTC). Therefore, the undersigned finds that the FTC has established an entitlement to $3,149,920.34 in restitution.

### 3. Ancillary Relief

Finally, The FTC seeks several forms of ancillary relief, including provisions concerning cooperation, order acknowledgments, compliance reporting, recordkeeping, and compliance monitoring.  (Doc. 84-1 at 12, 14-18).   The FTC contends that many courts in the Eleventh Circuit have included such provisions in similar cases because such provisions help the FTC monitor compliance with the final order.   (*Id*. citing (*Life Mgmt. Servs. of Orange Cty., LCC*, 350 F. Supp. 3d at 1279-83; *FTC v. All US Mktg. LLC*, 2017 WL 2256650 (M.D. Fla. May 22, 2017); *SlimAmerica, Inc.*, 77 F. Supp. 2d at 1276-77)).   Indeed, courts throughout the Eleventh Circuit have approved the inclusion of such ancillary provisions because, as the FTC contends, such provisions aid the FTC in ensuring compliance with the final order.  *See Life Mgmt. Servs. of Orange Cty., LCC*, 350 F. Supp. 3d at 1280-83 (entering an order containing provisions concerning cooperation, order acknowledgments, compliance reporting, recordkeeping, and compliance monitoring); *FTC v. Capital Choice Consumer Credit, Inc.*, No. 02-21050, 2004 WL 5141452, at *4 (S.D. Fla. May 5, 2004) ("It is well settled that 'record-keeping and monitoring provisions . . . are . . . appropriate to permit the Commission to police the defendants' compliance with the order.'") (quoting *SlimAmerica, Inc.,* 77 F. Supp. 2d at 1276).   In light of the foregoing authority and purpose of such provisions, the undersigned finds that the FTC is entitled to the ancillary relief requested in the Motion for Default Judgment.[4]

---

[4] The proposed order also contains three other provisions that the FTC does not address in the Motion for Default Judgment: 1) a provision concerning the modification of the asset freeze imposed on HGM in the Court's preliminary injunction order; 2) a provision terminating the appointment of Mr. Bernet as receiver over HGM; and 3) a provision retaining jurisdiction over the matter for the purpose of construing, modifying, and enforcing the final order.   (Doc. 84-1 at 10-14, 18).   These appear to be standard provisions in cases such as this and, as such, the undersigned sees no reason to prohibit them.   (Doc. 82 at 28 (retaining jurisdiction over this matter for purposes of construing, modifying, and enforcing the Stipulated Order)).   *See also Life Mgmt. Servs. of Orange Cty.*, *LCC*, 350 F. Supp. 3d at 1279 (modifying asset freeze imposed in the Court's

In addition to finding that the FTC is entitled to the injunctive, monetary, and ancillary relief it seeks against HGM, the undersigned notes that the sole manager of HGM, Defendant Anderson, does not oppose the Motion for Default Judgment (Doc. 84 at 6), and, hence, does not oppose the relief sought therein.  Also, the previously entered Stipulated Order contains much of the same relief against the Settling Defendants that the undersigned has found to be appropriate with respect to HGM.  (*Compare* Doc. 82 *with* Doc. 84-1).  For all of these reasons, the undersigned finds that the relief sought by the FTC, which is set forth in the proposed order attached to the Motion for Default Judgment (Doc. 84-1), is appropriate and should be granted.

## IV.   Conclusion

Accordingly, it is respectfully **RECOMMENDED** that:

1.  The Motion for Default Judgment (Doc. 84) be **GRANTED**.

2.  The Court **ENTER** the proposed order (Doc. 84-1) from the section entitled "Definitions" (*Id*. at 4) through the end of the proposed order (*Id*. at 18).[5]

### NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.  A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  *See* 11th Cir. R. 3-1.

---

preliminary injunction order); *FTC v. Laptop & Desktop Repair, LLC*, No. 1:16-cv-3591-AT, 2017 WL 6994570, at *4 (N.D. Ga. May 19, 2017) (including provision in final order terminating receivership).

[5] The first section of the proposed order contains a section entitled "Findings."  (Doc. 84-1 at 1-4).  It is not necessary for the Court to adopt that portion of the proposed order given the findings in this Report.

Recommended in Orlando, Florida on November 6, 2019.

LESLIE R. HOFFMAN
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy